# EXHIBIT B

Hearing Date: 7/1/2024 9:30 AM
Location: Court Room 2301
Judge: Quish, Clare J

FILED
2/22/2024 9:25 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH01108
Calendar, 14
26510686

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

| | | |
|---|---|---|
| **2120 - Served** | **2121 - Served** | **2620 - Sec. of State** |
| **2220 - Not Served** | **2221 - Not Served** | **2621 - Alias Sec of State** |
| **2320 - Served By Mail** | **2321 - Served By Mail** | |
| **2420 - Served By Publication** | **2421 - Served By Publication** | |
| **Summons - Alias Summons** | | **(12/01/20) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Name all Parties

MARY MASLANKA & DAVID FREIFELD,
on behalf of similarly situated individuals

Plaintiff(s)

v.

BAIRD & WARNER, INC., an Illinois
Corporation

Defendant(s)

Case No. **2024CH01108**

c/o Margaret Cabello, 120 S. LaSalle St., Ste.
2000, Chicago, IL 60603

Address of Defendant(s)

Please serve as follows (check one):  ○ Certified Mail   ○ Sheriff Service   ○ Alias

### SUMMONS

To each Defendant:

You have been named a defendant in the complaint in this case, a copy of which is hereto attached. You are summoned and required to file your appearance, in the office of the clerk of this court, within 30 days after service of this summons, not counting the day of service. If you fail to do so, a judgment by default may be entered against you for the relief asked in the complaint.

### THERE WILL BE A FEE TO FILE YOUR APPEARANCE.

To file your written appearance/answer **YOU DO NOT NEED TO COME TO THE COURTHOUSE**. You will need: a computer with internet access; an email address; a completed Appearance form that can be found at http://www.illinoiscourts.gov/Forms/approved/procedures/appearance.asp; and a credit card to pay any required fees.

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 3

**Summons - Alias Summons**          **(12/01/20) CCG 0001 B**

E-filing is now mandatory with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider.

If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/faq/gethelp.asp or talk with your local circuit clerk's office. If you cannot e-file, you may be able to get an exemption that allows you to file in-person or by mail. Ask your circuit clerk for more information or visit www.illinoislegalaid.org.

If you are unable to pay your court fees, you can apply for a fee waiver. For information about defending yourself in a court case (including filing an appearance or fee waiver), or to apply for free legal help, go to www. illinoislegalaid.org. You can also ask your local circuit clerk's office for a fee waiver application.

Please call or email the appropriate clerk's office location (on Page 3 of this summons) to get your court hearing date AND for information whether your hearing will be held by video conference or by telephone. The Clerk's office is open Mon - Fri, 8:30 am - 4:30 pm, except for court holidays.

**NOTE: Your appearance date is NOT a court date. It is the date that you have to file your completed appearance by. You may file your appearance form by efiling unless you are exempted.**

A court date will be set in the future and you will be notified by email (either to the email address that you used to register for efiling, or that you provided to the clerk's office).

**CONTACT THE CLERK'S OFFICE for information regarding COURT DATES by visiting our website: cookcountyclerkofcourt.org; download our mobile app from the AppStore or Google play, or contact the appropriate clerk's office location listed on Page 3.**

To the officer: (Sheriff Service)

This summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service. If service cannot be made, this summons shall be returned so endorsed. This summons may not be served later than thirty (30) days after its date.

| | |
|---|---|
| ● Atty. No.: 56618 | Witness date _____ |
| ○ Pro Se 99500 | |
| Name: McGuire Law, P.C. | 2/22/2024 9:25 AM IRIS Y. MARTINEZ |
| Atty. for (if applicable): | IRIS Y. MARTINEZ, Clerk of Court |
| Plaintiffs | ☐ Service by Certified Mail: _____ |
| Address: 55 W. Wacker Dr., 9th. Floor | ☐ Date of Service: _____ |
| City: Chicago | (To be inserted by officer on copy left with employer or other person) |
| State: IL  Zip: 60601 | |
| Telephone: (312) 893-7002 | |
| Primary Email: pgeske@mcgpc.com | |

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 2 of 3

FILED DATE: 2/22/2024 9:25 AM  2024CH01108

**GET YOUR COURT DATE BY CALLING IN OR BY EMAIL**

**CALL OR SEND AN EMAIL MESSAGE** to the telephone number or court date email address below for the appropriate division, district or department to request your next court date. Email your case number, or, if you do not have your case number, email the Plaintiff or Defendant's name for civil case types, or the Defendant's name and birthdate for a criminal case.

FILED DATE: 2/22/2024 9:25 AM 2024CH01108

### CHANCERY DIVISION
**Court date EMAIL:** ChanCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5133

### CIVIL DIVISION
**Court date EMAIL:** CivCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5116

### COUNTY DIVISION
**Court date EMAIL:** CntyCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5710

### DOMESTIC RELATIONS/CHILD SUPPORT DIVISION
**Court date EMAIL:** DRCourtDate@cookcountycourt.com
OR
ChildSupCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6300

### DOMESTIC VIOLENCE
**Court date EMAIL:** DVCourtDate@cookcountycourt.com
Gen. Info: (312) 325-9500

### LAW DIVISION
**Court date EMAIL:** LawCourtDate@cookcountycourt.com
Gen. Info: (312) 603-5426

### PROBATE DIVISION
**Court date EMAIL:** ProbCourtDate@cookcountycourt.com
Gen. Info: (312) 603-6441

### ALL SUBURBAN CASE TYPES

### DISTRICT 2 - SKOKIE
**Court date EMAIL:** D2CourtDate@cookcountycourt.com
Gen. Info: (847) 470-7250

### DISTRICT 3 - ROLLING MEADOWS
**Court date EMAIL:** D3CourtDate@cookcountycourt.com
Gen. Info: (847) 818-3000

### DISTRICT 4 - MAYWOOD
**Court date EMAIL:** D4CourtDate@cookcountycourt.com
Gen. Info: (708) 865-6040

### DISTRICT 5 - BRIDGEVIEW
**Court date EMAIL:** D5CourtDate@cookcountycourt.com
Gen. Info: (708) 974-6500

### DISTRICT 6 - MARKHAM
**Court date EMAIL:** D6CourtDate@cookcountycourt.com
Gen. Info: (708) 232-4551

**Iris Y. Martinez, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

Hearing Date: 7/1/2024 9:30 AM
Location: Court Room 2301
Judge: Quish, Clare J

FILED
2/22/2024 9:25 AM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH01108
Calendar, 14
26510686

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

**12-Person Jury**

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

| | | |
|---|---|---|
| MARY MASLANKA and DAVID FREIFELD, individually and on behalf of similarly situated individuals, | ) ) ) | |
| *Plaintiffs*, | ) ) | Case No. **2024CH01108** |
| v. | ) ) | |
| BAIRD & WARNER, INC., an Illinois Corporation, | ) ) ) | **JURY TRIAL DEMANDED** |
| *Defendant*. | ) ) ) | |

## CLASS ACTION COMPLAINT

Plaintiffs, Mary Maslanka and David Freifeld, both individually and on behalf of other similarly situated individuals, bring this Class Action Complaint against Defendant, Baird & Warner Inc. (hereinafter "Defendant" or "B&W"), and allege as follows based on personal knowledge as to their own acts and experiences and, as to all other matters, on information and belief, including an investigation by their attorneys.

### NATURE OF THE ACTION

1. This putative class action is brought against B&W – the second largest residential real estate brokerage firm in Illinois by sales volume – for engaging in and facilitating a conspiracy that perpetuates anti-competitive measures in the real estate broker market in Illinois. Defendant and its co-conspirators have adopted and implemented practices that keep real estate broker commissions artificially elevated, resulting in harm to both homebuyers and home sellers who are saddled with additional costs when buying or selling a home.

2. Defendant and its co-conspirators are members of the National Association of Realtors ("NAR"), a national trade association that provides advantages to its members, including

1

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

access to the primary Multiple Listing Services ("MLSs"). An MLS is essentially a searchable database that serves as a marketplace for available properties. According to the Department of Justice ("DOJ") MLSs are a joint venture among competing brokers to facilitate the publishing and sharing of information about homes for sale in a geographic area.[1]

3.     NAR and its members establish and enforce rules, policies, and practices that are adopted by NAR's 1,400+ local associations and their affiliated MLSs ("NAR MLSs"). Further, all Realtors in the United States are subject to NAR rules. NAR issues a Code of Ethics, which is binding on all Realtors, regardless of whether they operate in a NAR-affiliated MLS or an MLS not affiliated with NAR.

4.     The typical residential real estate transaction includes a real estate professional on the buyer-side ("buyer-agent" or "buyer-broker") and the seller-side ("seller-agent" or "seller-broker") that work for brokerage firms like Defendant and are paid commissions calculated as a percentage of the home's sale price. Seller-brokers and buyer-agents utilize MLSs to share and obtain information about properties for sale. The seller-broker lists the seller's property on an MLS, while the buyer-agent searches the MLS to find properties to propose to their homebuyer client. The vast majority of residential real estate transactions are facilitated through listings made available on an MLS.

5.     MLSs are regional by nature and serve certain geographic areas. According to the DOJ, membership of an MLS is generally comprised of nearly all residential real estate brokers and their affiliated agents in an MLS's service area. In each area an MLS serves, the MLS will

---

[1] *See* DOJ Backgrounder Q&A: National Association of REALTORS®, available at: https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recomm end,commission%20offered%20to%20buyer%20brokers.

FILED DATE: 2/22/2024 9:25 AM  2024CH01108

include or "list" the vast majority of homes that are for sale through a residential real estate broker in that area. In most areas, the local MLS provides the most up-to-date, accurate, and comprehensive compilation of the area's home listings.

6.      Both the supply side and the demand side of the housing market depend on MLSs. In order to effectively market and sell a property, a seller-broker has little choice but to list that property on an MLS because that is where buyer-agents search for properties for their homebuyer clients. Similarly, in order to understand the marketplace and determine which homes are listed for sale, a buyer-agent has little choice but to search an MLS for properties. In this way, MLSs are the digital gateway to home buying and home selling and comparatively few sales occur outside of the use of MLSs.

7.      There are hundreds of MLSs in the United States, which are tailored to specific regions. For example, the Midwest Real Estate Data ("MRED") is an MLS that covers the Chicago Metro Area and is NAR-associated, generally requiring NAR membership for access. A substantial number of MLSs, including most large regional MLSs, require NAR membership for access to listings.

8.      To be a member of NAR, real estate brokerage firms such as Defendant must adhere to NAR's policies and guidelines, including those which apply to broker commissions.

9.      Defendant is heavily intertwined with NAR and the MRED, which are both headquartered in the Chicagoland area. NAR frequently involves prominent brokers from large residential real estate firms such as Defendant to serve in leadership positions concurrently with their position as real estate brokers. For example, Dean Rouso, a broker and senior vice president at Defendant, is a member of NAR who has "served on the board of directors of the National Association of REALTORS® and in the Illinois Association of REALTORS® License Law

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

Working Group, which crafted much of the Illinois Broker License Laws as we know them today."[2] Mr. Rouso has also served as President of the MRED's board of directors and board President of Mainstreet Organization of REALTORS®.[3] Mr. Rouso and other brokers who have worked for Defendant guide NAR's strategic direction and policymaking in areas such as legislation, professional standards, and business services—influencing the NAR rules that apply to their industry.

10.     NAR, Defendant, and their co-conspirators have created and implemented anti-competitive rules and policies related to broker commissions that have harmed consumers by, among other things, causing them to incur substantial additional costs in the form of inflated broker commissions and increased home prices.

11.     For instance, Defendant and its co-conspirators have adopted and followed NAR rules requiring every seller broker that lists a property on an MLS to make a blanket unilateral offer of compensation to all potential buyer brokers, even when the buyer-broker is working on behalf of the buyer, not the seller. This rule further requires that the offer provide the exact same compensation terms to all potential buyer brokers without regard to the buyer-broker's experience, the services they are providing to the buyer, or the financial arrangement they have made with the buyer.

12.     The blanket unilateral offer of compensation rule creates tremendous pressure on sellers to offer a high commission to attract buyer brokers and deter them from "steering" buyers away from their property and in favor of other properties offering higher buyer-broker commissions. The anticompetitive effects are further reinforced by other NAR rules, such as those

---

[2] https://www.bairdwarner.com/our_management_team/dean-rouso/
[3] *Id.*

4

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

which provide that after the seller has received purchase offers, the seller-broker is prohibited from attempting to unilaterally modify the buyer-broker commission that was offered on the MLS. As a result, a seller cannot respond to a purchase offer with a counteroffer that is conditional on reducing the buyer-broker commission. Nor can the seller, after receiving purchase offers, decide to unilaterally reduce or eliminate the buyer-broker commission offered on the MLS.

13. This anti-competitive behavior has also led to higher buyer-agent commission fees that otherwise would be subject to negotiation by homebuyers. This collusion among brokers thus begins at the very gateway to homebuying and home selling (the MLSs) and extends through the homebuying and home selling process.

14. Defendant and NAR have also implemented anti-competitive rules that directly harm homebuyers, including mandating that a set portion of the home sale price be allocated toward buyer-agent commissions (the "Mandatory Commission Rule").[4] This rule eliminates competition between buyer-agents with respect to their commission rate and the quality of their services. This lack of competition leads to inflated commission rates and homebuyers receiving lower quality services. As a result, the Mandatory Commission Rule overcompensates buyer-agents at the expense of consumers.

15. During the relevant time period, NAR and its co-conspirators such as Defendant exacerbated the anti-competitive effect of the Mandatory Commission Rule through other rules which prohibit buyer-agents from making home purchase offers contingent upon a reduction of

---

[4] 2023 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 41 MLS Policy Statement 7.31 available at:
https://cdn.nar.realtor/sites/default/files/documents/pdf_mls_handbook-2023-08-11.pdf?_gl=1*6co9sx*_gcl_au*ODk0MjQ3MzYxLjE3MDE2NjYyNjQ. (hereinafter "NAR MLS Handbook 2023")

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

the buyer-agent's commission ("Non-Modification Rules")[5] and prohibit the disclosure to buyers of the commission to be paid to buyer-agents ("Commission Concealment Rule").[6]

16.    During the relevant time period, the NAR ethics code also permitted and encouraged buyer-agents to advertise their services as "free," despite the fact that buyer-agents are actually paid their commission from the sale price of the home.[7] The result is that the amounts of buyer-agents' commissions are opaque and ill-understood by the homebuyers and home sellers whose home prices fund those commissions.

17.    This anti-competitive behavior has led to homebuyers paying inflated fees for misrepresented "free" broker services, overpaying for properties (whose purchase price necessarily incorporates the inflated commissions that cannot be reduced), and receiving overpriced and biased broker services.

18.    Moreover, NAR MLSs permit buyer-agents to filter searches for properties by commission amount, and during the relevant time period, NAR ethics rules permitted buyer-agents to show these filtered properties with high commissions to buyers ("MLS Manipulation Practices").[8] Naturally, this conflict of interest led to buyer-agents promoting properties that will maximize their commission, which lowers demand for properties that offer lower commissions and thus eliminates competition from discount brokers. This harms homebuyers, who receive

---

[5] Code of Ethics and Arbitration Manual 2023, National Association of REALTORS®, at Standard of Practice 16-16 available at: https://cdn.nar.realtor/sites/default/files/documents/2023-coe-standards-of-practice-2022-12-28.pdf (hereinafter "NAR Code of Ethics 2023")

[6] NAR MLS Handbook 2023 at p. 40, Policy Statement 7.23
[7] Code of Ethics and Arbitration Manual 2018, National Association of REALTORS®, at p. 10 Standard of Practice 12-2, available at: https://www.nar.realtor/sites/default/files/documents/2018-CEAM-v1.pdf (hereinafter "NAR Code of Ethics 2018")

[8] 2018 Handbook on Multiple Listing Policy, National Association of REALTORS®, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4 available at:
https://www.nar.realtor/sites/default/files/documents/2018-HMLP-v1.pdf (hereinafter "NAR MLS Handbook 2018")

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

diminished, biased services from buyer-agents who prefer that homebuyers only purchase homes that offer high commissions and also harms home sellers by (a) increasing commissions for services provided by buyer-brokers to the buyer, who is the seller's adversary in the transaction; (b) raising, fixing, and stabilizing buyer-broker compensation at levels that would not exist in a competitive marketplace; and (c) encouraging and facilitating steering and other actions that impede innovation and entry by new and lower-cost real estate brokerage service providers.

19.    These anti-competitive rules permit Defendant and other NAR members to sustain broker fees at artificially high levels which would not exist in a competitive marketplace.

20.    Defendant and other members of NAR not only protect and promote their conspiracy by exerting control over and manipulating the MLSs – which constitute the gateway to homebuying and home selling – but also through control over the homebuying experience. For instance, NAR regulations restrict physical access to houses for sale to only NAR members, making it difficult for non-members to conduct showings which further reduces competition from unaffiliated brokers.[9]

21.    These rules and practices, adopted and enforced by NAR members including Defendant, constitute agreements among real estate brokers who would otherwise be competing. Defendant's implementation of these agreements is clearly anti-competitive, an unreasonable restraint on trade, and benefits only Defendant and other NAR members.

22.    Defendant wields significant market power in the markets in which it operates. Not only is Defendant the second largest brokerage in Illinois by sales volume, Defendant's CEO and president, Steve Baird, is considered one of "the most powerful players in the residential real estate

---

[9] NAR MLS Handbook 2023, at p. 41 MLS Policy Statement 7.31.

industry."[10] Defendant's prominent market position means that its involvement is crucial to the success of the conspiracy with NAR and other brokers. Defendant has consented to engage in, facilitate, and execute this conspiracy, playing a significant role within NAR and mandating that its agents comply with NAR's anti-competitive agreements as a prerequisite for accessing the benefits of Defendant's brand and infrastructure, including MLSs.

23.     Since late 2020, when the DOJ sued NAR for antitrust violations,[11] NAR has begun walking back from certain anti-competitive rules discussed herein. However, the harms caused to American homebuyers and home sellers for decades have not been remedied, nor have the billions in ill-gotten commissions been disgorged. During the relevant time period and prior to changes to NAR's rules and policies, however, the rules, regulations, and practices that furthered the conspiracy remained materially consistent.

24.     Defendant's and its co-conspirators' advancement of the conspiracy alleged herein has markedly diminished competitive practices in both the buyer-agent service sector and the seller-agent sector, negatively impacting homebuyers and home sellers. This conspiracy has empowered Defendant and other market participants to elevate and stabilize agent commissions at levels that are unnaturally high compared to those supported by a competitive market, thus harming homebuyers and home sellers.

---

[10] *Power players in Chicago real estate named to SP 200*, Chicago Agent Magazine (Jan. 16, 2024), available at
https://chicagoagentmagazine.com/2024/01/16/chicago-real-estate-swanepoel-power-200/.
[11] Justice Department Files Antitrust Case and Simultaneous Settlement Requiring National Association of Realtors® To Repeal and Modify Certain Anticompetitive Rules,
https://www.justice.gov/opa/pr/justice-department-files-antitrust-case-and-simultaneous-settlement-requiring-national.

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

25.     The conspiracy has resulted in inflated and stabilized real estate agent commissions, higher average costs of homes, and lower quality services provided to homebuyers and home sellers.

26.     Plaintiffs and the other members of the classes they seek to represent have suffered significant monetary damages, each incurring thousands of dollars in excess commission fees due to Defendant's involvement in the conspiracy alleged herein.

27.     As explained in more detail below, Defendant's anticompetitive practices have unreasonably restrained trade in violation of the Illinois Antitrust Law, Illinois consumer protection laws, and Illinois common law. Accordingly, Plaintiffs, both individually and on behalf of the members of the putative classes defined below, bring this suit against Defendant for these infractions, seeking actual and treble damages, an order for injunctive relief, and reasonable attorneys' fees.

## PARTIES

28.     Plaintiff David Freifeld is a resident and citizen of Illinois. In or about July 2019, Plaintiff Freifeld purchased a property and sold a property in the Chicagoland area using an agent affiliated with B&W. Both of the properties purchased and sold by Plaintiff were listed on a local MLS service that, on information and belief, was run by associations with boards of directors comprised entirely of NAR members who must adhere to NAR's guidelines and policies.

29.     Plaintiff Mary Maslanka is a resident and citizen of Illinois. In or about June 2012, Plaintiff Maslanka sold a property in La Grange Illinois with the Dean Rouso Home Team affiliated with B&W. The home Plaintiff sold was listed on a local MLS service that, on information and belief, was run by associations with boards of directors comprised entirely of NAR members who must adhere to NAR's guidelines and policies.

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

30.     Defendant, Baird & Warner, Inc., is an Illinois corporation organized under the laws of Illinois, with its principal place of business in Cook County, Illinois. Defendant also has several offices in Cook County and transacts business in Cook County as well as throughout the state of Illinois.

## JURISDICTION AND VENUE

31.     This Court may assert personal jurisdiction over Defendant pursuant to 735 ILCS 5/2-209 in accordance with the Illinois Constitution and the Constitution of the United States because Defendant is organized under the laws of this state, Defendant is doing business within this state, and because Plaintiffs' claims arise out of Defendant's unlawful in-state actions, as Defendant's conduct as alleged herein emanated from its offices located within this state.

32.     Venue is proper in in the Circuit Court of Cook County pursuant to 735 ILCS 5/2-101, because Defendant is doing business in Cook County and thus resides there under 735 ILCS § 5/2-102(a), and because the transactions or occurrences, or some part thereof, out of which Plaintiffs and the members of putative Classes claims arose occurred in Cook County.

## COMMON FACTUAL ALLEGATIONS

**A.    Background on Real Estate Broker Commissions**

33.     State laws govern who can represent sellers and buyers in real estate transactions. There are two types of licenses: (1) for real estate brokers (or brokerage firms such as Defendant), and (2) for individual agents (such as Defendant's employees). Generally, only licensed brokers can legally be paid for representing buyers or sellers in real estate deals, according to state law. So all real estate contracts and payments are made to brokers, not agents. Brokers then pay their agents and are legally responsible for their agents' actions.

34.     A typical home sale begins with a homeowner (the seller) entering into a contract with a listing agent called a listing agreement. The listing agreement includes the terms of the listing and often provides that the seller-broker has the exclusive right to market the seller's home.

35.     The listing agreement also specifies the brokers' compensation. For the vast majority of residential real estate transactions, brokers and agents on both the buyer and seller side are paid based on a percentage of the property's sale price. The seller typically agrees to pay the seller-broker 6% in total commissions for facilitating the sale of the home pursuant to the listing agreement. When the seller-broker lists the house on an MLS, NAR rules require them to make a blanket unilateral offer of compensation to all potential buyer-brokers (i.e., the "Mandatory Commission Rule"). Accordingly, seller-brokers typically make a blanket unilateral offer of a 3% commission to any buyer-agent that can bring a buyer to the table to complete the sale.

36.     Importantly, due to the Mandatory Commission Rule, the listing agreement effectively specifies the total commission that a home seller will pay to the seller-broker *and* the amount earmarked to be paid to the buyer-broker.

37.     When residential real estate is purchased, the buyer pays the purchase price into an escrow account where it is then paid to the seller, less the commissions, which are paid to the seller-broker and the buyer-broker.

38.     Because the escrow company distributes the commission, homebuyers often do not realize that they are effectively sharing the commission costs with the seller. Making matters even more opaque, NAR's Code of Ethics in effect during the relevant time period allowed and even encouraged buyer-agents to represent that their services are "free."[12] In reality, however, homebuyers pay for these "free" services through elevated commission rates and higher home

---

[12] NAR Code of Ethics 2018, at p. 10 Standard of Practice 12-2.

purchase prices. Similarly, sellers also bear some of the costs of buyer-agent commissions because those commissions come out of the proceeds of the sale. Accordingly, both buyers and sellers bear the costs of broker commissions.

39.     As a result of the Mandatory Commission Rule, buyer-brokers—who are supposed to assist buyers in negotiating against the seller—receive their compensation from the total commission paid from the proceeds of the sale, not directly from the buyer they represent. Real estate insiders recognize that the Mandatory Commission Rule leads to a marketplace where there is "a lot of confusion around how commissions work," where even writers for real estate publications "never get[] a very clear cut answer from the industry or from anyone" on the subject.[13] And other market participants have agreed that the practice is "confusing" and that most consumers "just don't understand how commission works."[14]

40.     Absent the Mandatory Commission Rule, and in a competitive market, a homebuyer would instead pay their own broker directly, and a seller would likewise agree to pay a commission that would go solely toward the seller's own broker. The seller's total broker commission would thus be approximately half (or less) than the amount that sellers have paid as a total commission to compensate both their selling broker and their adversary's broker, the buying broker.

41.     Additionally, in a competitive market, brokers would compete as to the rates of their commissions, and both homebuyers and home sellers would be able to bargain as to lower

---

[13] See FTC-DOJ Joint Public Workshop, Segment 1 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-3/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ segment_3.pdf.
[14] FTC-DOJ Joint Public Workshop, Segment 2 Tr., June 5, 2018, *available at* https://www.ftc.gov/system/files/documents/videos/whats-new-residential-real-estate-brokerage-competition-part-2/ftc-doj_residential_re_brokerage_competition_workshop_transcript_ segment_2.pdf.

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

commission rates with their respective agents. As such, homebuyers and sellers would not be exposed to such inflated costs, higher purchase prices, and elevated commission rates.

**B.      Home Buying and Home Selling in America Runs Through NAR and its Co-Conspirators Like Defendant, Who Dominate the MLSs in their Respective Regions.**

42.      According to its website, NAR is the largest trade group in the U.S.[15] It includes over 1.5 million members in the real estate field including real estate agents, brokers, managers, and appraisers.[16] Being a NAR member carries benefits like insurance, access to property listings on preferred MLSs, training, and more. In 2020, NAR reported that nearly 90% of homebuyers used a broker to buy a home.

43.      NAR promulgates and enforces rules and policies that its members follow in real estate transactions. On a yearly basis, NAR issues its Handbook on Multiple Listing Policy which requires, *inter alia,* that NAR members align their policies with those set by NAR's board of directors. Regional brokerages and MLSs abide by these rules, and real estate agents must likewise obey them.

44.      Numerous additional entities, including NAR-affiliated MLSs, real estate brokerages, and local realtor associations, although not listed as defendants in this case, have actively engaged with Defendant and NAR as co-conspirators. In particular, each of the local realtor associations responsible for owning and managing NAR MLSs at issue here consented to, adhered to, and implemented the Mandatory Commission Rule. Accordingly, Defendant is liable for the acts of its co-conspirators, whether named or not named as defendants in this Complaint.

45.      The NAR MLSs, along with others, have been active co-conspirators in the anticompetitive conduct detailed herein, carrying out actions that promote this conduct. This

---

[15] *See* https://www.nar.realtor/

[16] *Id.*

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

includes the adoption of the Mandatory Commission Rule within their respective rules and policies.

46.     Defendant specifically complied with and implemented the Mandatory Commission Rule and other anti-competitive rules in Illinois. In addition, other brokers in Illinois have participated as co-conspirators in the violations alleged herein and performed acts and made statements in furtherance thereof.

47.     Defendant and its co-conspirators are intertwined with NAR and assert significant market power in the markets where they operate. For instance, Defendant is heavily involved in MRED, a prominent MLS that serves nearly 50,000 real estate professionals in Chicagoland and the surrounding counties. Defendant's senior vice president of strategic innovation, Dean Rouso, has served as a two-term President of MRED's board of directors while maintaining his management role at B&W.[17] Mr. Rouso has also served on the board of directors of the National Association of REALTORS® and in the Illinois Association of REALTORS® License Law Working Group, which crafted much of the Illinois Broker License Laws that exist today.[18]

48.     Additionally, Defendant's senior vice president of residential sales, John Matthews, has served on MRED's board of directors since 2012, and he currently sits on the National Association of REALTORS'® Top 75 Large Firms Directors Forum.[19]

49.     MRED (the MLS for which John Matthews is a board member and Dean Rouso served as a two-term president), like other NAR MLSs, is critical to real estate transactions. Both the supply and demand side of the residential real estate market in Illinois rely on MRED. Buyer-agents use MRED to find real estate listing information and seller-brokers use MRED to list their

---

[17] *See supra* n.2.
[18] *Id.*
[19] https://www.bairdwarner.com/our_management_team/john-matthews/

FILED DATE: 2/22/2024 9:25 AM  2024CH01108

clients' residential real estate for sale. If a seller-broker does not list a property on MRED, many Illinois buyer-agents will not find it, let alone show it to their clients. Indeed, MRED is recognized by many including the Chicago Association of Realtors as "the MLS of choice" and "[o]ne of the most important member services the Chicago Association of REALTORS® has to offer[.]"[20]

50.     Defendant and its co-conspirators dominate the market for buyer-agent and seller-agent services in Illinois. Defendant, through its franchisees, agents, and affiliates, provides a significant portion of the residential real estate broker services in the state of Illinois. Additionally, by controlling rules governing transactions on the MLSs, Defendant and its co-conspirators can enforce the Mandatory Commission Rule and other anti-competitive NAR rules on homebuyers, home sellers, and other market participants. Access to MLSs is vital for brokers to compete and work with homebuyers and home sellers in Illinois.

51.     Buyer-brokers and seller-brokers in Illinois would face overwhelming obstacles if they tried to compete outside of the MLSs like MRED. Due to Defendant's and its co-conspirators' dominance over the MLSs, brokers not involved in the conspiracy would have to create a new listing service to rival the conspirators or try to compete without one. Seller-brokers not using an MLS would miss out on most potential buyers, while buyer-agents not using an MLS would miss out on most sellers. Essentially, without access to a listing service, brokers cannot compete effectively.

52.     To effectively rival a NAR MLS, any new listing service must offer as extensive a range of listings. Brokers and their agents, who benefit from high buyer-agent commissions, have little reason to join a new service that could lead to increased competition and reduced commissions. Moreover, many homebuyers would hesitate to hire agents from such a service,

---

[20] https://chicagorealtor.com/realtor-tools/mls/

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

especially since buyer-agents on NAR MLSs have represented that their services were free to buyers and fully paid by sellers during most of the relevant time period. Also, buyer-agents would be wary of using a service with fewer property options. Consequently, seller-brokers on alternative services would find it hard to attract agents and their clients. Hence, a listing service trying to compete with a NAR MLS would likely struggle to gather enough listings to be profitable and challenge the established MLSs. The current lack of competitive listing services indicates significant entry barriers.

53.     To further limit competitive pricing pressure, NAR recommends that MLSs include non-compete clauses as a vital part of their agreements with third-party listing websites like Zillow seeking MLS data access. According to NAR's list of "critical components," such non-compete agreements should ensure that the third-party website agrees not to rival brokerage firms like Defendant or MLSs by either turning into a licensed brokerage or offering cooperation and compensation deals. NAR also recommends that these agreements should prevent the third-party website from using the data in ways that mirror the functions of an MLS. Therefore, as part of the conspiracy, NAR advises MLSs to actively work to stop third-party websites from emerging as competitors.

**C.     Defendant and its Co-Conspirators Have Adhered to NAR's Anti-competitive Rules, Regulations, and Standards of Practice.**

54.     NAR and its co-conspirators suppress competition in a number of ways, primarily through requiring buyer-agents and seller-brokers to conform to NAR's rules as a condition of membership. NAR's Handbook, Code of Ethics, and Standards of Practice enforce various rules, policies, and practices on all NAR members, including NAR MLSs and Defendant.

55.     As NAR's Code of Ethics specified during the relevant time period: "[a]ny Member Board which shall neglect or refuse to maintain and enforce the Code of Ethics with respect to the

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

business activities of its members may, after due notice and opportunity for hearing, be expelled by the Board of Directors from membership in the National Association."[21]

56.     Further, NAR's Handbook on Multiple Listing Policy stipulates that association and association-owned MLSs must conform their governing documents to the mandatory MLS policies established by the National Association's Board of Directors to ensure continued status as member boards and to ensure coverage under the master professional liability insurance program.[22]

57.     NAR empowers its MLSs to fine, suspend, and revoke the membership of MLS users that do not comply with NAR regulations. Given the commercial necessity of access to the NAR MLSs, brokers and agents are compelled to adhere to these mandatory provisions. Without access to local MLSs, a broker or agent would be incapable of listing or viewing properties for sale in the centralized database.

58.     To ensure that its rules are being followed, NAR also conducts examinations of the governing documents of its local realtor associations to verify their adherence to its rules. Further, NAR obligates its local realtor associations to prove their compliance with these rules by periodically submitting their governing documents to NAR for evaluation.

59.     NAR offers many benefits to its realtor associations and the MLSs they own, including professional liability insurance. To qualify for this insurance, however, realtor associations and their MLSs must adhere to the mandatory provisions in the Handbook on Multiple Listing Policy. NAR withholds these insurance benefits from realtor associations and MLSs that fail to comply with its mandatory provisions. Indeed, NAR's Handbook currently reads: "[t]hose associations or multiple listing services found by the National Association to be operating under

---

[21] NAR Code of Ethics 2018, at p. 241 Section 2.

[22] NAR MLS Handbook 2018 at p. 161; NAR MLS Handbook 2023, at p. 169.

bylaws or rules and regulations not approved by the National Association are not entitled to errors and omissions insurance coverage and their charters are subject to review and revocation."[23]

60.    During the relevant time period, NAR's rules and policies have included numerous collusive and anti-competitive requirements: (i) the Mandatory Commission Rule; (ii) rules preventing the disclosure to homebuyers of the total broker commissions in a home sale ("Commission Concealment Rules"); (iii) policies limiting the ability of sellers and seller-brokers to change the commissions offered to buyer-agents after a purchase offer is made ("Non-Modification Rules"); (iv) policies that allow and encourage buyer-agents to inform homebuyers that their services come at no cost ("Free-Service Rule"); (v) guidelines enabling buyer-agents to filter MLS listings based on commission levels ("MLS Manipulation Practices"); and (vi) a policy restricting access to key-holding lockboxes to NAR members only ("Lockbox Policy").[24]

61.    NAR and its members maintain a defined arrangement: Members can join the MLS and receive benefits from NAR and NAR MLSs, but only if they commit to follow and implement the anti-competitive restraints outlined in NAR's rules, practices, and policies. As a result, the implementation and enforcement of these guidelines by NAR, its members, and NAR MLSs constitute coordinated actions among parallel competitors, forming agreements among (should-be) rival real estate brokers. These agreements diminish price competition among brokers, resulting in elevated commissions, increased costs, and lesser service quality for American homebuyers and home sellers.

62.    Defendant has played a pivotal role in the conspiracy described above by, among

---

[23] NAR MLS Handbook 2023, at p. 8 Policy Statement 7.17

[24] Many of these anti-competitive rules were implicated in the DOJ's investigation of NAR. https://www.justice.gov/opa/press-release/file/1338606/download#:~:text=NAR's%20Commission%2DConcealment%20Rules%20recommend,commission%20offered%20to%20buyer%20brokers.

FILED DATE: 2/22/2024 9:25 AM  2024CH01108

other things: mandating that its employees, franchisees, and the agents working under them adhere to NAR rules, including the anti-competitive rules listed above; and exerting influence over local realtor associations by, for instance, requiring adoption of NAR's rules, such as the Mandatory Commission Rule.

63.     Defendant's rules and policies require its franchisees and agents to (1) adhere to NAR's Code of Ethics; (2) become members of and follow local realtor association rules; and (3) participate in and comply with the rules of the local MLS, which include the mandatory provisions of NAR's Handbook on Multiple Listing Policy.

**D.      The Mandatory Commission Rule, Commission Concealment Rule, and Non-Modification Rule are Unreasonable Restraints on Trade.**

**i.      Mandatory Commission Rule.**

64.     During the relevant time period, the Mandatory Commission Rule has read: "In filing a property with the multiple listing service of an association of REALTORS®, the participant of the service is making blanket unilateral offers of compensation to the other MLS participants, and shall therefore specify on each listing filed with the service, the compensation being offered to the other MLS participants."[25]

65.     The Mandatory Commission Rule has further stated throughout the relevant time period that: "multiple listing services shall not publish listings that do not include an offer of compensation expressed as a percentage of the gross selling price or as a definite dollar amount, nor shall they include general invitations by listing brokers to other participants to discuss terms and conditions of possible cooperative relationships."[26]

---

[25] NAR MLS Handbook 2018, at p. 65 Section 5; NAR MLS Handbook 2023, at p. 69 Section 5.

[26] NAR MLS Handbook 2018, at p. 35 Section 5; NAR MLS Handbook 2023, at p. 40 Section 5.

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

66.     This practice has been widely, if not universally, adopted. Indeed, nearly every MLS in the U.S. requires listing-brokers to extend a blanket offer of compensation to buyer-agents.

67.     The Mandatory Commission Rule prevents buyer-agents from competing on terms such as price and service quality. Therefore, the Mandatory Commission Rule curtails competition in the market for buyer-agent services, adversely affecting homebuyers and home sellers in various ways.

68.     Because NAR and its members provide blanket, unilateral, unconditional commissions, buyer-brokers have little incentive to compete in terms of service quality to earn higher commissions. For instance, new brokers who have only recently obtained their licenses can charge the same rates as seasoned, highly skilled brokers. Similarly, when broker commissions are based on a percentage of the gross selling price, a buyer-agent assisting in an $800,000 home purchase could earn potentially double compared to one assisting in a $400,000 home purchase, irrespective of whether the higher compensation matches the level and nature of services rendered.

69.     This practice has drawn the ire of consumer watchdog organizations. Indeed, the Consumer Federation has called brokers "a price-setting cartel." As the Federation explained, "[i]n a rational pricing system, home sellers and buyers would each pay for real estate brokerage services they receive."[27] But, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform [] commissions would quickly disappear."[28]

70.     The Mandatory Commission Rule lacks any pro-competitive rationale. Before the

---

[27] Testimony of Stephen Brobeck, *Residential Real Estate Brokerage Services: a Cockamamie System that Restricts Competition and Consumer Choice*, CONSUMER FED'N OF AM., at 3-4 (July 25, 2006), available at https://consumerfed.org/wp-content/uploads/2006/07/7-25-06-Residential-Real-Estate-Brokerage_Testimony.pdf.

[28] Stephen Brobeck and Patrick Woodall, *How the Real Estate Cartel Harms Consumers and How Consumers Can Protect Themselves*, CONSUMER FED'N OF AM., at 4 (June 2006), available at https://consumerfed.org/pdfs/Real_Estate_Cartel_Study061906.pdf.

early 1990s, all brokers either represented sellers or were subagents of those representing sellers. Under this almost universal sub-agency system, brokers, even those working solely with buyers, were legally obligated to represent the interests of sellers. Because nearly all brokers involved in transactions represented the seller either as the seller's agent or as the subagent of the listing (i.e., seller's) broker, the seller's broker, who received payment from the seller, would then remunerate the subagent assisting the buyer.

71.     But with the advent of brokers representing buyers directly, payment of buyer-agents' commissions from the total commission is no longer justified. Real estate industry insiders have conceded that the practice of seller-brokers dictating the fees that buyer-agents charge to their own clients should be recognized as potentially fixing market prices. There is no pro-competitive justification for allowing seller-brokers to determine the default commissions charged by competing buyer-agents to their clients. Rather, removing inter-broker compensation would reduce brokers' ability to impede price competition, likely resulting in a significant decrease in broker commissions.

72.     The reason for the Mandatory Commission Rule is clear: to maintain high broker commissions for NAR members at the expense of homebuyers and home sellers. In the absence of the Rule, buyers rather than sellers would negotiate buyer-agent commissions, and brokers would compete with one another by offering lower commission rates and/or higher-quality services.

   **ii.     Commission Concealment Rules.**

73.     The Commission Concealment Rules protect the Mandatory Commission Rule and exacerbate its anti-competitive effects. These rules bar disclosure of the offered buyer-agent commission to potential homebuyers.

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

74.     The Commission Concealment Rules have appeared in several places in NAR's Handbook during the relevant time period, including Policy Statement 7.23, which states: "the multiple listing service shall not publish the total negotiated commission on a listing which has been submitted to the MLS by a participant. The multiple listing service shall not disclose in any way the total commission negotiated between the seller and the listing broker."[29]

75.     Hence, while buyer-agents are aware of the commission they'll receive if their client buys a property, NAR MLSs keep this fee hidden from the homebuyers who ultimately bear some of the costs of the commission through the property's purchase price.

76.     At the same time, NAR rules require brokers to share pricing information among themselves. This kind of unilateral information sharing agreement is collusive and further diminishes the incentive for buyer-agents to compete on pricing, whether by offering rebates or accepting reduced commissions. It also promotes and facilitates the setting of consistently high commission rates by brokers, leading to increased costs for buyer-broker and seller-broker services. Moreover, because buyers are unable to view commission offers, they are unable to identify when they are being steered toward a property with a high commission. As explained below, this type of steering leads to higher prices and diminishes the quality of services provided by buyer-agents to homebuyers and requires.

### iii.    Non-Modification Rules.

77.     NAR's ethical rules during the relevant time period explicitly forbade buyer-agents from attempting to decrease the buyer-agent commissions listed on MLSs when submitting purchase offers ("Non-Modification Rules"). Therefore, even if a homebuyer were able to access

---

[29] NAR MLS Handbook 2018, at p. 34 Section 1 Policy Statement 7.23; NAR MLS Handbook 2023, at p. 40 Section 1 Policy Statement 7.23

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

sufficient information to negotiate a reduced buyer-agent commission, NAR's rules wouldn't allow such negotiations. Although NAR frequently claims in litigation that brokers can purportedly negotiate their fees at any point in the transaction, NAR's Standard of Practice 16-16 in effect during the relevant time period has provided that:

> REALTORS®, acting as subagents or buyer/tenant representatives or brokers, shall not use the terms of an offer to purchase/lease to attempt to modify the listing broker's offer of compensation to subagents or buyer/tenant representatives or brokers nor make the submission of an executed offer to purchase/lease contingent on the listing broker's agreement to modify the offer of compensation.[30]

78.     In other words, a buyer-agent cannot even present an offer to a seller that is conditional on the seller reducing the buyer-agent commission without violating the NAR's ethics rules. This does nothing but unreasonably restrain homebuyers and homes sellers to the benefit of NAR members such as Defendant.

79.     When buyer-agents do try to alter buyer-agent commissions, NAR advises them to initiate these modifications before they even show the property to prospective buyers. By obliging buyer-agents who are open to reducing their commissions to seek these reductions before showing the property to a potential buyer, NAR effectively shuts down most negotiation over the buyer-agent commission. To adhere to this, a buyer-agent would have to independently approach a seller-broker to negotiate a cut in their own commission, even before their client has viewed the potential home. In practice, this is unlikely to occur because it would require buyer-agents to proactively approach seller-brokers and negotiate commissions where no buyer has yet been identified. As NAR knows, this will be seen by most individuals as a speculative waste of time.

80.     NAR's rules also limit the negotiation of the buyer-agent commission by stipulating

---

[30] NAR Code of Ethics 2018, at Standard of Practice 16-16; NAR Code of Ethics 2023, at Standard of Practice 16-16.

that once the seller has received purchase offers, the seller-broker is not allowed to unilaterally alter the buyer-agent commission originally offered on the MLS. This is outlined in NAR Standard of Practice 3-2, which stated during the relevant time period that:

> Any change in compensation offered for cooperative services must be communicated to the other REALTOR® prior to the time that REALTOR® submits an offer to purchase/lease the property. After a REALTOR® has submitted an offer to purchase or lease property, the listing broker may not attempt to unilaterally modify the offered compensation with respect to that cooperative transaction.[31]

81.     Consistent with NAR's rules, the MRED Rules and Regulations, for example, state that a listing broker may only offer a buyer-agent compensation that differs from the compensation indicated on the listing if the seller-broker "informs the other broker in writing or in accordance through the Service in advance of his producing an offer to purchase . . . ."[32]

82.     NAR further restricts negotiation by deeming it unethical for a buyer-agent to suggest that the buyer directly negotiate with the seller to lower commissions. Given that most homebuyers have little to no understanding of this market and are under the impression that the buyer-agent's services are "free," this limitation additionally curbs negotiations concerning buyer-agent commissions.

83.     Additionally, NAR's restriction on buyer-brokers negotiating their commissions inflates the cost of commissions incurred by a home seller as they have no way of knowing of or accepting a competing offer from a buyer-broker offering a lower a commission rate.

---

[31] NAR Code of Ethics 2018, at Standard of Practice 3-2; NAR Code of Ethics 2023, at Standard of Practice 3-2.

[32] Section 5: Division of Commissions, Rules and Regulations, Midwest Real Estate Data, MRED Quick Reference Guide. (Revised Feb. 2019), https://ww2.mredllc.com/wp-content/uploads/2018/07/MRED-Rules-and-Regulations.pdf.

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

**E.** **The Free-Service Rule and MLS Manipulation Practices Allow Defendant and its Co-Conspirators to Improperly Steer Homebuyers to Higher-Commission Listings.**

84.     During the relevant time period, Defendant also adopted NAR's Free-Service Rule, which encouraged buyer-agents to mislead buyers into thinking that the buyer-agent's services are free when actually they are not.

85.     During the relevant time period and until January 2021, NAR Ethics Standard 12-2 stated "REALTORS® may represent their services as 'free' or without cost even if they expect to receive compensation from a source other than their client provided that the potential for the REALTOR to obtain a benefit from a third party is clearly disclosed at the same time." Because buyer-agents governed by NAR are technically paid out of funds routed through the sale proceeds, buyer-agents can misleadingly tell their buyer clients that their services are "free." As a result, homebuyers think they are paying nothing for buyer-agent services, when in reality the buyer-agent's commissions are incorporated into and taken out of the purchase price of the home.

86.     Because buyers were led to believe that they were not paying for brokerage services, they were not inclined to negotiate for a lower buyer-agent commission or seek out or discover appealing rebate offers or other discounts from buyer-agents. As such, NAR's Free-Service Rule contributed to elevated costs for services rendered by buyer-agents.

87.     NAR's MLS Manipulation Practices are yet another set of rules that hinder competition and contribute to elevated commissions.

88.     During the relevant time period, NAR's MLS Manipulation Practices enabled buyer-agents to curate MLS listings according to the amount of buyer-agent commissions being offered. Additionally, some MLSs even allow buyer-agents to exclude homes from potential homebuyers when they offer lower commissions, despite meeting the buyer's search requirements.

89.     For instance, during the relevant time period, Policy Statement 7.58 in NAR's

Handbook read: "Participants may select the IDX listings they choose to display based only on objective criteria including . . . cooperative compensation offered by listing brokers."[33]

90.     The MLS Manipulation Practices, adopted by Defendant and NAR MLSs during the relevant time period, aid in steering by enabling buyer-agents to selectively hide from potential homebuyers those property listings that offer lower buyer-agent commissions. This practice, which has since been repealed,[34] diminished the quality of services provided by buyer-agents and increases the cost of these services for homebuyers.

**F.     The Lockbox Policy Shuts out Competitors.**

91.     Further reducing competition for buyer-agent and seller-agent services, NAR and its member brokers also restrict physical access to listed properties through the use of lockboxes that are available only to real estate brokers who are part of a NAR MLS. These brokers, with the consent of the sellers, store keys to the homes listed for sale in lockboxes, enabling them to grant potential buyers access to the properties while ensuring their security. Access to these lockboxes is controlled by real estate brokers using either a numerical code or a digital Bluetooth 'key' which is not provided to non-members of NAR.

92.     NAR and NAR MLSs have implemented a set of rules (outlined in the NAR Handbook, Policy Statement 7.31) that limit lockbox access solely to real estate brokers who are members of NAR and subscribe to the NAR MLS.[35] Brokers not affiliated with NAR are denied access to these lockboxes, preventing them from showing their clients homes listed for sale, which in turn diminishes competition in the realm of buyer-broker and seller-broker services.

---

[33] NAR MLS Handbook 2018, at p. 23 Policy Statement 7.58; P. 81 Section 18.2.4.

[34] NAR MLS Handbook 2023, at p. 23 Policy Statement 7.58; P. 87 Section 18.2.4.

[35] NAR MLS Handbook 2018, at p. 36 Policy Statement 7.31; NAR MLS Handbook 2023, at p. 41 Policy Statement 7.31.

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

### G.    The Conspiracy Harms Both Homebuyers and Home Sellers.

93.    The anti-competitive rules and policies developed and implemented by NAR, Defendant, and their co-conspirators have collectively functioned to sustain elevated commission rates and deteriorate the quality of services that consumers receive from brokers. These rules and policies have led to increased buyer-broker and seller-broker commissions despite technological advancements and other changes that should have noticeably decreased commissions. Additionally, they have considerably hindered the capacity of more cost-effective alternatives to foster a more competitive market.

94.    There is no pro-competitive benefit to the conspiracy between NAR, Defendant, and their co-conspirators. Defendant and its co-conspirators have effectively maintained and significantly raised the financial costs of buyer-broker and seller-broker commissions, despite the diminishing role of such buyer-brokers and seller brokers due to the emergence of third-party listing websites. NAR data indicates that many homebuyers now prefer to search for prospective homes independently through online services, rather than with a broker's help, and buyer-brokers are increasingly engaged only after their client has identified the desired home. Yet, despite the reduced involvement of brokers, agents still receive the same artificially high commission due to the conspiracy among Defendant and other brokers.

95.    The conspiracy between Defendant and other brokers has had many anti-competitive effects, including:

    a.    Homebuyers and home sellers have both incurred elevated commissions, which are incorporated into the purchase price that homebuyers pay and deducted from sale proceeds that home sellers receive;

    b.    Seller-brokers are disinclined to offer commissions below market rate for fear that the seller's house will not be shown;

    c.    The engagement of a buyer-broker has become disconnected from the

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

determination of the broker's commission, because even though the homebuyer hires the buyer-broker, the buyer-broker's compensation is determined by an agreement with the seller-broker;

d. There has been a suppression of price competition among brokers retained by both homebuyers and home sellers;

e. Home buyers' and home sellers' competitive ability has been hindered due to their inability to compete for home purchases by reducing either the buyer-broker or seller-broker commissions;

f. The quality of services provided by buyer-brokers has declined, as they are motivated to direct their clients towards homes offering higher commissions;

g. The quality of buyer-broker services has further deteriorated due to obstacles that impede buyer-brokers from presenting and receiving purchase offers that lower the buyer-broker commission, thereby making these offers more appealing and acceptable to sellers;

h. Brokers have significantly increased their profits by obtaining inflated buyer-broker and seller-broker commissions and thus inflated total home purchase prices;

i. Home sellers have been forced to pay commissions to buyer-brokers—their adversaries in negotiations to sell their homes—substantially inflating the cost of selling their homes;

j. Home sellers have been compelled to set a high buyer-broker commission to induce buyer-brokers to show their homes to homebuyers;

k. Both homebuyers and home sellers have paid additional costs for real estate transactions from inflated broker commissions;

l. The retention of a buyer-broker has been severed from the setting of the broker's commission;

m. Price competition among brokers to be retained by home buyers has been restrained;

n. Defendant has profited substantially by receiving inflated commissions.

96.    Defendant and its co-conspirators have not only maintained but, in terms of inflation-adjusted dollars, significantly increased the fees charged by buyer-brokers and seller-brokers, a situation that markedly contrasts with trends in other industries. In almost every

28

consumer sector — including bookselling, retail, home appliances, insurance, banking, and stock brokering — the emergence of technology and the proliferation of internet and discount sellers has tremendously benefited customers financially. Economists refer to this reduction of transaction costs as "disintermediation." The real estate brokerage market, worth approximately $70 billion annually, is particularly suited for such a transformation. Yet, despite the technological advancements that have diminished the role of brokers and the considerable fluctuations in housing market prices, brokerage fees have not adapted to these changes. This resilience, or "stickiness" in commissions is attributable to the collusive conspiracy alleged herein.

97.     There is also a notable discrepancy between broker costs and the commissions they earn. In a competitive market, pressure from and among competitors forces prices toward the marginal cost of goods (or services) sold. However, this pattern is not evident in real estate brokerage fees. For instance, the costs incurred by buyer-brokers are generally consistent, and have trended downward with technology, irrespective of the home's price. As noted by the Wall Street Journal, "many, if not most, of the services that Realtors provide don't vary with the sales price, so the percentage fee should fall as home price rises." Contrary to this expectation, broker commissions remain disconnected from the amount, quality, and value of the services provided.

98.     Even if there were any plausible pro-competitive effects of Defendant's and its co-conspirators' conspiracy, those effects would be substantially outweighed by the conspiracy's anti-competitive effects.

99.     There is considerable economic evidence that Defendant's and its co-conspirators' conspiracy has inflated broker commissions well above a competitive level throughout Illinois.

100.    The conspiracy among Defendant and its co-conspirators has consistently kept broker commission rates at exceptionally stable and elevated levels over the past two decades. This

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

trend persists despite the emergence of the internet and the reduced role of buyer-brokers. From 2000 to 2017, the average national commission rate remained consistently high, between 5% and 5.4%, irrespective of varying market conditions.

101. Housing prices in many areas have risen significantly recently, surpassing the rate of inflation. Given that commissions are calculated as a percentage of a home's sale price, the real dollar value of commissions has substantially increased alongside the price of homes. "For example, between 2001 and 2017, the average price of new homes in current dollars sold rose from $213,200 to $384,900, according to U.S. Census Bureau Statistics."[36]

102. As the Consumer Federation of America points out: "[b]ecause the industry functions as a cartel, it is able to overcharge consumers tens of billions of dollars a year. . . . Consumers are increasingly wondering why they are often charged more to sell a home than to purchase a new car."[37]

103. The typical total broker commissions (i.e., the combined commission for the seller-broker and buyer-broker) in regions with NAR MLSs range from 5% to 6%, markedly higher than in countries with competitive residential real estate brokerage markets. In their 2002 study "International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry," economists Natalya Delcoure and Norm Miller observed: "Globally, we see much lower residential commission rates in most of the other highly industrialized nations, including the United Kingdom (UK), Hong Kong, Ireland, Singapore, Australia, and New Zealand. . . . In the

---

[36] *Comments of Stephen Brobeck, Executive Director Consumer Federation of America Before the Department of Justice-Federal Trade Commission Public Workshop on Competition Issues*, CFA, 2 n.4 (June 5, 2018), https://consumerfed.org/wp-content/uploads/2018/06/CFA-comments-DOJ-FTC-publicworkshop-on-competition-issues.pdf.

[37] Glen Justice, *Lobbying to Sell Your House*, N.Y. TIMES (Jan. 12, 2006), https://www.nytimes.com/2006/01/12/business/lobbying-to-sell-your-house.html.

FILED DATE: 2/22/2024 9:25 AM  2024CH01108

UK, the [total] commission rates average less than 2%. . . . In New Zealand and South Africa, [total] commission rates average 3.14%. In Singapore, the [total] commission rates also tend to run around 3%."[38]

104.    Delcoure and Miller also noted variations within countries. For instance, in the United Kingdom, Delcoure and Miller found that "1%-2% is typical; in very competitive areas 0.5- 0.75%; in low priced areas [for homes] as high as 3.5%."[39] Ultimately, they concluded that, "[b]ased on global data . . . [total] US residential brokerage fees should equal something closer to 3.0%."[40] That is approximately *half* of what such fees are now.

105.    Indeed, economists Chang-Tai Hsieh and Enrico Moretti have proposed that competition could potentially eliminate over half of the current commission rates.[41]

106.    The conspiracy to restrict price competition for commissions has had a significant negative economic impact. The Consumer Federation of America noted, "[i]f sellers and buyers each separately negotiated compensation with their brokers, uniform 5-6% commissions would quickly disappear."[42] This suggests that the current uniform commission rates are maintained by the lack of individual negotiation and competition.

107.    The extent and significance of the overcharges at issue in this case have resulted in a tremendous economic burden for the putative classes and their respective members and other consumers. Experts have estimated that consumers could save approximately $30 billion or more

---

[38] Natalya Delcoure & Norm G. Miller, *International Residential Real Estate Brokerage Fees and Implications for the US Brokerage Industry*, 5 INTL. REAL ESTATE REV. 12, 14 (2002).

[39] *Id.* at 17.

[40] *Id.* at 29.

[41] *See* Chang-Tai Hsieh & Enrico Moretti, *Can Free Entry be Inefficient? Fixed Commissions and Social Waste in the Real Estate Industry*, 111 J. POL. ECON. 1076, 1116 (2003).

[42] Brobeck & Woodall, *Supra* n.6.

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

each year if there were price competition among brokers.[43]

**H.    Due to the Concealment of the Conspiracy and Plaintiffs' Reasonable Lack of Knowledge Thereof, the Statute of Limitations has Been Tolled.**

108.    In the years leading up to the filing of this Complaint, Defendant continuously engaged in anti-competitive behavior. This includes the implementation and enforcement of the Mandatory Commission Rule and other anti-competitive NAR rules discussed above. Defendant continues some of these practices to this day.

109.    As a result of its conspiracy, Defendant has consistently charged and collected, and continues to charge and collect excessive broker commissions. These were paid by Plaintiffs and the members of the Classes in connection with their purchase or sale of residential real estate. Every instance of paying these inflated commissions by the Plaintiffs and the members of Classes during the class period resulted in harm to them and created a new cause of action. Plaintiffs and the members of the Classes had no knowledge of Defendant's unlawful conspiracy and could not have discovered it by the exercise of due diligence until, at the earliest, November 19, 2020, the date the DOJ announced the settlement of its antitrust claims against NAR.

110.    It was reasonable for Plaintiffs and the members of the Classes to not suspect Defendant of engaging in illegal, anti-competitive conduct. Plaintiffs and the members of the Classes are typical homebuyers and home sellers who lack extensive knowledge or insights about the real estate industry and are not familiar with NAR's operations. Further, as explained above, NAR's policies, rules, and practices explicitly forbade revealing the total broker commissions to homebuyers and encouraged buyer-brokers to represent to their clients that they were receiving the brokers' services at no cost. Consequently, the average homebuyer is not aware that they are

---

[43] Mark S. Nadel, *A Critical Assessment of the Traditional Residential Real Estate Broker Commission Rate Structure (Abridged)*, 5 CORNELL REAL ESTATE REV. 26, 26 n.1 (2007).

incurring costs for buyer-broker services, much less that Defendant is conspiring to uphold excessively high broker commissions.

111.    For these reasons, the statutes of limitation applicable to Plaintiffs' and the other Classes members' claims have been tolled with respect to the claims asserted herein.

112.    Additionally, or alternatively, application of the doctrine of fraudulent concealment tolled the statutes of limitation on Plaintiffs' and the members' of the Classes claims until at least November 19, 2020.

113.    Defendant actively concealed the conspiracy by, for example, prohibiting the disclosure of total commissions to homebuyers and encouraging brokers to represent to homebuyers that their services are free of charge.

114.    Moreover, Defendant's anti-competitive behavior was intrinsically self-concealing given NAR's strict control over its regulated MLSs, agents, and brokers. A reasonable homebuyer or seller, under the circumstances, would not have had grounds to suspect exposure to anti-competitive actions. The policy that prevents NAR MLSs from disclosing to prospective buyers the commission a buyer-broker will receive for a home purchase on the MLS naturally hides the conspiracy's existence. Similarly, practices that allow buyer-agents to falsely claim their services are complimentary to buyers, and actions by Defendant to filter MLS listings based on buyer-broker commission levels and exclude homes offering lower commissions, are also inherently self-concealing to home sellers.

## CLASS ALLEGATIONS

115.    Pursuant to 735 ILCS 5/2-801, Plaintiffs Maslanka and Freifeld bring this action both individually and on behalf of a Class of similarly situated homebuyers (hereinafter "Homebuyer Class") and on behalf of a Class of similarly situated home sellers (hereinafter "Home

33

Seller Class"). The Home Seller Class and Homebuyer Class (together "Classes") are defined as follows:

> **The Home Seller Class:** All Illinois citizens who, from December 1, 1996 through the present, sold residential real estate in the state of Illinois that was listed on a NAR MLS with a buyer-agent and/or seller-agent employed by or otherwise affiliated with Defendant or any of its franchisees, subsidiaries, agencies, or otherwise affiliated entities.

> **The Homebuyer Class:** All Illinois citizens who, from December 1, 1996 through the present, purchased in the state of Illinois residential real estate listed on a NAR MLS with a buyer-agent and/or seller-agent employed by or otherwise affiliated with Defendant or any of its franchisees, subsidiaries, agencies, or otherwise affiliated entities.

116.    Expressly excluded from the Classes are any members of the judiciary assigned to preside over this matter and their staff; Plaintiffs' counsel and Defendant's counsel; any officer, director, or employee of Defendant and its affiliates; and any immediate family members of such officers, directors, or employees.

117.    On information and belief, there are at least tens of thousands, if not hundreds of thousands, of members of each of the Classes, making the members of the Classes so numerous that joinder of all members is impracticable. Although the exact number of members of the Classes is presently unavailable to Plaintiffs, the members of both Classes can easily be ascertained through Defendant's records.

118.    Plaintiffs will fairly and adequately represent and protect the interests of the other members of the Classes they seek to represent. Plaintiffs have retained counsel with substantial experience in prosecuting complex litigation and class actions. Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the other members of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel has any interest adverse to those of the other members of the Classes.

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

119.    Plaintiffs' claims are typical of the claims of the other members of the Classes, in that the factual and legal bases of Defendant's liability to Plaintiffs and to the other members of the respective Classes they seek to represent are the same. Plaintiffs and the other members of the members of the Classes have all suffered similar harms and damages as a result of Defendant's collection of unlawfully excessive commissions.

120.    There are many questions of law and fact common to the claims of Plaintiffs and the other members of the Classes, and those questions predominate over any questions that may affect individual members of the Class. Common questions for the Classes include, but are not limited to:

a.    Whether Defendant conspired with NAR and its other co-conspirators as alleged herein;

b.    Whether the conspiracy harmed competition as alleged herein;

c.    Whether the conduct of Defendant and its co-conspirators caused injury to the business or property of Plaintiffs and the other members of the Classes.

d.    Whether homebuyers were harmed as a result of Defendant's anti-competitive conduct as alleged herein;

e.    Whether home sellers were harmed as a result of Defendant's anti-competitive conduct as alleged herein;

f.    Whether buyer-agent commissions and seller-agent commissions were inflated as a result of Defendant's conspiracy;

g.    Whether the quality of buyer-agent services was diminished as a result of the conspiracy;

h.    Whether the competitive harm from the conspiracy substantially outweighs any competitive benefits;

i.    Whether Defendant committed deceptive acts under the ICFA by representing to the members of Classes that buyer-agent fees were free, paid by the seller, or otherwise not ultimately paid by the buyer;

j.    Whether Defendant should be enjoined from engaging in such conduct in the

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

future;

k.  The appropriate class-wide measures of damages for the Classes; and

l.  Whether Defendant should be ordered to disgorge all unlawful fees collected by it or on its behalf during the applicable limitations period.

121.    This class action is appropriate for certification because class proceedings are superior to other available methods for the fair and efficient adjudication of this controversy and the joinder of all members of the Classes is impracticable. This proposed class action presents fewer management difficulties than individual litigation and provides the benefits of single adjudication, economies of scale, and comprehensive supervision by a single court. Class treatment will create economies of time, effort, and expense and promote uniform decision-making.

122.    Absent a class action, most members of the Classes would find the cost of litigating their claims to be prohibitive and would have no effective remedy. Unless these Classes are certified, Defendant will retain the monies it received from the members of the Classes as a result of its unfair and deceptive conduct.

### COUNT I
**Commission-Fixing Conspiracy in Violation of the Illinois Antitrust Act**
**740 ILCS 10/1 *et seq.***
**(On Behalf of Plaintiffs and the Home Seller Class)**

123.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as though stated herein.

124.    Beginning at least as early as 1996, Defendant engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Illinois for the purpose and with the effect of fixing, controlling, or maintaining broker commissions in violation of the Illinois Antitrust Act.

125.    The contract, combination, or conspiracy alleged herein has consisted of a

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

continuing agreement among Defendant and its co-conspirators to require home sellers to pay cooperating brokers and to pay an inflated amount.

126. In furtherance of the contract, combination, or conspiracy, Defendant and its co-conspirators have committed one or more of the following overt acts:

a. Participated in the establishment, implementation and enforcement of the Mandatory Commission Rule and other anticompetitive NAR rules;

b. Participated in the establishment, implementation and enforcement of rules by local NAR associations and MLSs that implemented the Mandatory Commission Rule and other anticompetitive NAR rules; and

c. Included provisions in franchise agreements, policy manuals, and other corporate agreements with franchisees, affiliates, and Realtors that required the implementation of and adherence to the Mandatory Commission Rule and other anticompetitive NAR rules.

127. Defendant's conspiracy has required sellers nationwide to pay buyer-brokers, to pay an inflated buyer-broker commission and an inflated total commission, and has restrained price competition among buyer-brokers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

128. Defendant's conspiracy has caused buyer-broker commissions and total commissions to be inflated. Plaintiff Maslanka and the other members of the Home Seller Class paid these inflated commissions out of the sale proceeds of their homes in connection with the sale of residential real estate. Absent Defendant's conspiracy, Plaintiff Maslanka and the other members of the Home Seller Class would have paid substantially lower commissions because buyers would have the incentive to set and negotiate buyer-broker prices (and buyer-broker

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

commissions would not be at supra-competitive levels).

129.    By engaging in the aforementioned conduct, Defendant intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*

130.    Plaintiff Maslanka and the other members of the Home Seller Class seek damages as permitted by law for the injuries they suffered as a result of Defendant's anti-competitive conduct.

131.    Accordingly, with respect to Count I, Plaintiffs, both individually and on behalf of the proposed Home Seller Class, pray for the relief set forth below.

**COUNT II**
**Commission-Fixing Conspiracy in Violation of the Illinois Antitrust Act**
**740 ILCS 10/1 *et seq.***
**(On Behalf Plaintiff Freifeld and the Homebuyer Class)**

132.    Plaintiff Freifeld realleges and incorporates by reference each of the foregoing allegations as though stated herein.

133.    Beginning at least as early as 1996, Defendant engaged in a continuing contract, combination, or conspiracy with respect to broker services provided in Illinois for the purpose and with the effect of fixing, controlling, or maintaining the commissions paid to Defendant's buyer-agents. Defendant's conduct constitutes an unreasonable restraint of trade in or substantially affecting commerce in Illinois.

134.    Defendant's agreement to uphold NAR rules, policies, and procedures related to buyer-agent compensation is *per se* unlawful under 740 ILCS 10/3 because Defendant and its co-conspirators agreed to fix the commissions to be paid to buyer-agents. Defendant's commission-fixing conspiracy was not reasonably necessary to any separate, legitimate business purpose, transaction, or collaboration.

38

FILED DATE: 2/22/2024 9:25 AM  2024CH01108

135.    Defendant's acts and combinations in furtherance of the conspiracy have caused unreasonable restraints in the market for buyer-agent services within Illinois.

136.    Defendant's conspiracy has caused buyer-agents to conceal total commissions, to misrepresent to homebuyers that buyer-agents' services are free, to steer homebuyers towards higher commission listings, and to diminish the value of buyer-agent services by restraining competition on buyer-agent commission fees in the homebuying process. Defendant's conspiracy has also had the effect of excluding non-NAR-affiliated brokers from competing in the market for buyer-agent services by restricting access to lockboxes, which is required in order for buyer-agents to show houses for sale to their clients.

137.    Defendant's conspiracy has also reduced competition among buyer-agents, thereby requiring buyers to pay inflated prices for their homes and inflated buyer-agent commissions. Reduced price competition among buyer-agents has also reduced the quality of broker services provided to homebuyers. This harm to competition substantially outweighs any competitive benefits arising from the conspiracy.

138.    As a result of Defendant's unlawful conduct, Plaintiff and the other members of the Homebuyer Class have been harmed by paying inflated commissions incorporated into the purchase prices for their homes in addition to the harm caused by receiving lower quality or fewer services.

139.    By engaging in the aforementioned conduct, Defendant intentionally and wrongfully engaged in a contract, combination, or conspiracy in restraint of trade in violation of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*

140.    Plaintiff Freifeld and other members of Homebuyers Class seek damages as permitted by law for the injuries they suffered as a result of Defendant's anti-competitive conduct.

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

141.    Accordingly, with respect to Count II, Plaintiff Freifeld, individually and on behalf of the proposed Homebuyers Class, prays for the relief set forth below.

**COUNT III**
**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1 *et seq.***
**(On Behalf of Plaintiffs and the Classes)**

142.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

143.    Section 2 of the Illinois Consumer Fraud and Deceptive Business Practices Act provides in relevant part that:

> Unfair methods of competition and unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of any trade or commerce are hereby declared unlawful whether any person has in fact been misled, deceived or damaged thereby.

815 ILCS 505/2.

144.    Plaintiffs and the other members of the Classes are "consumers" within the meaning of Section 1(e) of the ICFA, because Defendant's business activities involve trade or commerce, are addressed to the market generally, and implicate consumer protection concerns.

145.    Defendant's conduct in misrepresenting its buyer-agents' services as being provided free of charge to buyers is a deceptive practice in violation of Section 2 of the ICFA.

146.    As explained above, Defendant misrepresented to Plaintiffs and the other members of the Classes that:

    a.    Its buyer-agents' services are provided free of charge to buyers;

    b.    Buyer-brokers' commissions are paid by the seller; and

    c.    Buyer-brokers' commissions must be paid uniformly regardless of the broker's experience, skill, or contribution to the homebuying process.

40

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

147.    Additionally, Defendant deceptively omitted and concealed the amounts of buyer-agent commissions offered to potential buyer-agents on MLSs and concealed that its listing software steered buyers toward properties with higher buyer-agent commissions.

148.    Defendant intended that Plaintiffs and the other members of the Classes rely on its misrepresentations. Indeed, Defendant knowingly and intentionally made the deceptive representations as to buyer-agent commissions in order to maintain the commissions at an artificially elevated rate.

149.    Plaintiffs and the other members of the Classes did actually rely upon and were actually deceived by Defendant's misrepresentations. Plaintiffs and the other members of the Classes would have acted differently had they known that Defendant's buyer-agent commissions were inflated, such as by, among other things, seeking out buyer-agents with discounted commissions or negotiating lower commission rates.

150.    As a direct and proximate result of Defendant's anti-competitive, deceptive, unfair, unconscionable, and fraudulent conduct, Plaintiffs and the Members of the Classes have been harmed and suffered actual damages through payment of higher commissions and/or higher prices for their homes due to inflated buyer-agent commissions in exchange for lower quality of services.

151.    Further, Defendant's violations of the Illinois Antitrust Act, 740 ILCS 10/1 *et seq.*, constitute unfair business practices under the ICFA. Defendant's actions unfairly imposed additional, unlawful costs on Plaintiffs and the other members of the Classes in the form of elevated home prices and excessive buyer-agent and seller-agent commissions. Defendant's actions are thus oppressive, unethical, and unscrupulous, and have caused substantial injury to consumers.

152.    Plaintiffs bring this claim on behalf of themselves and on behalf of the other

41

FILED DATE: 2/22/2024 9:25 AM    2024CH01108

members of the Classes pursuant to Section 10a of the ICFA, which permits Plaintiffs to bring a private cause of action for the above violations and entitles Plaintiffs and the other members of the Classes to actual damages, injunctive relief, as well as costs and reasonable attorney's fees.

153.    Accordingly, with respect to Count III, Plaintiffs, both individually and on behalf of the proposed Classes, pray for the relief set forth below.

**COUNT IV**
**Unjust Enrichment**
**(On Behalf of Plaintiffs and the Classes)**

154.    Plaintiffs reallege and incorporate by reference each of the foregoing allegations as if fully set forth herein.

155.    Defendant received benefits from Plaintiffs and the members of the Classes and unjustly retained those benefits at their expense. For example, Plaintiffs and the members of the Classes paid supracompetitive commissions to agents employed by Defendant or its co-conspirators. Defendant's financial benefits resulting from its unlawful and inequitable conduct are economically traceable to overpayments for buyer-agent commissions and seller-broker commissions by Plaintiffs and members of the Classes

156.    Additionally, Defendant promulgated and enforced anti-competitive rules, including the Mandatory Commission Rule, Commission Concealment Rules, Free-Service Rule, Non-Modification Rules, MLS Manipulation Practice and Lockbox Policy in order to raise, set, and maintain high commission rates and otherwise reduce competition in the market for buyer-agent and seller-broker services for its own gain, providing Defendant with economic, intangible, and other benefits.

157.    Defendant unjustly retained those benefits at the expense of Plaintiffs and members of the Classes because Defendant's conduct damaged Plaintiffs and the members of the Classes,

all without providing any commensurate compensation to Plaintiffs and members of the Classes.

158.    The benefits that Defendant derived from Plaintiffs and the members of the Classes rightly belong to Plaintiffs and members of the Classes. It would be inequitable under unjust enrichment principles for Defendant to be permitted to retain any of the profit or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

159.    Defendant should be compelled to disgorge in a common fund for the benefit of Plaintiffs and the members of the Classes all unlawful or inequitable proceeds it received, and such other relief as the Court may deem just and proper.

160.    Accordingly, with respect to Count IV, Plaintiffs, both individually and on behalf of the proposed Classes, pray for the relief set forth below.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, on their own behalf and on behalf of the members of the Classes, pray that the Court enter an order:

    A.    Certifying the Homebuyer Class and the Home Seller Class proposed above, appointing Plaintiffs as class representatives of the respective Classes, and appointing the undersigned counsel as Class counsel;

    B.    Declaring that Defendant's actions, as set forth in this Complaint, violate the Illinois Antitrust Act and the Illinois Consumer Fraud and Deceptive Business Practices Act;

    C.    Awarding Plaintiffs and the other members of the Classes their actual damages under the ICFA, 815 ILCS 505/10a;

    D.    Awarding Plaintiffs and the other members of the Classes an amount equal to three times their actual damages under the Illinois Antitrust Act 740 ILCS 10/7;

    E.    Awarding Plaintiffs and the other members of the Homebuyer Class and the Home Seller Class all other available damages and/or restitution in an amount to be determined at trial;

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

FILED DATE: 2/22/2024 9:25 AM   2024CH01108

F.      Awarding Plaintiffs pre- and post-judgment interest;

G.      Awarding Plaintiffs their costs of suit, including reasonable attorney's fees and expenses;

H.      Granting injunctive relief and permanently enjoining and restraining Defendant from maintaining or re-establishing the same or similar anti-competitive rules, policies, or practices as those challenged in this action in the future; and

I.      Awarding such further and additional relief as the Court may deem just and proper.

## DEMAND FOR JURY TRIAL

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: February 22, 2024                                  Respectfully submitted,

MARY MASLANKA & DAVID
FREIFELD, individually and on behalf of
similarly situated individuals

By: */s/ Paul T. Geske*
One of Plaintiffs' attorneys

Evan Meyers
Paul T. Geske
Brendan Duffner
MCGUIRE LAW, P.C.
55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
emeyers@mcgpc.com
pgeske@mcgpc.com
bduffner@mcgpc.com

*Counsel for Plaintiffs' and the putative*
*Classes*

Hearing Date: 7/1/2024 10:00 AM - 10:05 AM
Location: <<CourtRoomNumber>>
Judge: Calendar, 14

FILED
2/22/2024 3:57 PM
IRIS Y. MARTINEZ
CIRCUIT CLERK
COOK COUNTY, IL
2024CH01108
Calendar, 14
26524416

## CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, CHANCERY DIVISION

|  |  |  |
|---|---|---|
| MARY MASLANKA and DAVID FREIFELD, individually and on behalf of similarly situated individuals, | ) ) ) ) | |
| *Plaintiffs*, | ) ) | No. 2024-CH-01108 |
| v. | ) ) | Hon. Clare J. Quish |
| BAIRD & WARNER, INC., an Illinois Corporation, | ) ) ) | |
| *Defendant*. | ) ) | |

### NOTICE OF FILING

To:    Baird & Warner, Inc.
       c/o Margaret Cabello.
       120 S. Lasalle St., Ste. 2000.
       Chicago, IL 60603

PLEASE TAKE NOTICE that on February 22, 2024, *Plaintiffs' Motion for Class Certification or, Alternatively, for a Deferred Class Certification Ruling Pending Discovery* was filed with the Clerk of Court for the Circuit Court of Cook County. A copy of said document is attached hereto and hereby served upon you.

Dated: February 22, 2024,                           Respectfully Submitted,

                                                    MARY MASLANKA & DAVID
                                                    FREIFELD, individually and on behalf of
                                                    similarly situated individuals,

                                                    By: */s/ Paul T. Geske*
                                                    One of Plaintiffs' Attorneys

                                                    Evan Meyers
                                                    Paul T. Geske
                                                    Brendan Duffner
                                                    Colin Primo Buscarini
                                                    MCGUIRE LAW, P.C. (Firm#56618)

1

55 W. Wacker Drive, 9th Fl.
Chicago, IL 60601
Tel: (312) 893-7002
Fax: (312) 275-7895
emeyers@mcgpc.com
pgeske@mcgpc.com
bduffner@mcgpc.com
cbuscarini@mcgpc.com

*Counsel for Plaintiffs' and the putative
Classes*

## CERTIFICATE OF SERVICE

The undersigned, an attorney, hereby certifies that on February 22, 2024, the foregoing *Notice of Filing* as well as the accompanying *Motion* and *Memorandum of Law* were filed with the Clerk of Court, with true and correct copies served on Defendant via its registered agent below by special process server as soon as service may be effectuated:

Baird & Warner, Inc.
c/o Margaret Cabello.
120 S. LaSalle St., Ste. 2000.
Chicago, IL 60603

/s/ *Paul T. Geske*
Paul T. Geske

3